# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RACHEL SILER and FIONNUALA COOK, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 12 CV 3080 |
| v. ) | |
| ) | Hon. Charles R. Norgle |
| CITY OF CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Plaintiffs Rachel Siler ("Siler") and Fionnuala Cook ("Cook") (collectively, "Plaintiffs") sue Defendants Sergeant Thompson ("Thompson"), Officer Sommerfield ("Sommerfield"), and the City of Chicago (the "City") (collectively, "Defendants") for, *inter alia*, false arrest, excessive force, and unreasonable seizure pursuant to 42 U.S.C. § 1983. Before the Court is Defendants' motion for partial summary judgment on all of Siler's claims and on Cook's failure to intervene claim against Sommerfield. For the following reasons, the motion is granted as to all of Siler's claims, and denied as to Cook's claim for failure to intervene.

## I. BACKGROUND

### A. Facts[1]

On Tuesday, November 1, 2011, during rush hour traffic between 5 and 6 p.m., Plaintiffs traveled east on Jackson Boulevard in downtown Chicago, Illinois. Plaintiffs had just left an "Occupy Chicago" protest at the intersection of LaSalle Street and Jackson Boulevard in order to attend another gathering in the South Loop. Cook traveled in the street on her bicycle. Although there was an adjacent sidewalk, Siler traveled in the street next to Cook by way of her motorized

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements and notes disputed facts, if any, within the text.

wheelchair. Thompson, a sergeant in the Chicago Police Department ("CPD"), observed Siler in her wheelchair traveling in the street. He followed Plaintiffs as they traveled down Jackson and turned right on Clark Street. Thompson noticed that Siler was wearing all black clothing and riding in a black wheelchair, although Plaintiffs state that the wheelchair also had two reflective stripes on it.

Approximately halfway between Jackson and Van Buren Street, Thompson pulled beside Siler and parked his marked vehicle at a slight angle facing the curb. Thompson exited his vehicle and told Siler that she needed to use her wheelchair on the sidewalk because he did not want her to get hit by any cars. Siler then maneuvered around Thompson and his police vehicle and continued down Clark Street at her motorized wheelchair's top speed. Thompson once again told Siler to exit the bike lane of the street where she was traveling.

Siler ignored Thompson's orders. Thompson then got back into his vehicle, turned on his flashing lights, and continued to follow Siler until they reached the intersection of Clark and Van Buren streets. Thompson once again pulled in front of Siler, blocking her path, and exited his vehicle. Thompson told Siler that wheelchairs were not allowed in the street, at which time Siler explained that it was her "fucking right" to ride in the street and that "Mayor Daley supported the rights of people with disabilities."[2] Pls.' Local Rule 56.1(b)(3)(A) Resp. to Defs.' Statement of Alleged Undisputed Facts ¶ 26.

Thompson asked Siler for her identification card at least five times, but she failed to respond for approximately two minutes while she made phone calls to her work supervisor and then her attorney seeking advice on how to proceed. Siler made the calls through her earphones which were attached to her phone located in her purse. While she was on the phone, Thompson

---

[2] The Court notes that at the time of the incident on November 1, 2011, Rahm Emanuel was the Mayor of Chicago, not Richard M. Daley.

2

attempted to get Siler's attention by grabbing for her purse. When Thompson "yanked" on Siler's purse, her earphones fell out of her ears. Id. ¶ 32. Siler testified at her deposition that Cook was able to catch her purse before it fell to the ground. Plaintiffs allege that Thompson then grabbed Cook by her arms and slammed her into the metal support beam of the adjacent elevated train.[3] It is undisputed that Sommerfield was not present at the time of this alleged occurrence.

After Siler's attorney advised her over the phone to turn over her identification card, she finally complied with Thompson's request. Siler claims that she was frightened by Thompson. Meanwhile, Thompson called for backup to assist him in writing a citation. CPD Officer Sommerfield arrived shortly thereafter and was told by Thompson that Siler had been traveling in her motorized wheelchair in the street instead of on the sidewalk.

It is undisputed that there were sidewalks located on both Jackson Boulevard and Clark Street where Siler was traveling. Nevertheless, Siler argues that the sidewalks were in poor condition containing "bumps, potholes and defects and steep incline . . . [which] would have caused Ms. Siler to pitch forward in her chair and she does not possess the independent body strength to support herself and keep herself from falling out of her wheelchair." Defs.' Resp. to Pls.' Local Rule 56.1(b)(3)(C) Statement of Additional Facts ¶ 4. Defendants dispute that this was the reason for which Siler traveled in the street as opposed to utilizing the sidewalks. Instead, Defendants contend that Siler traveled in the street because that is what she had been doing for the last nine years and because she thought that it was quicker and more convenient to travel in the bicycle lane of the street next to Cook, her personal assistant who "aide[s] her in activities of daily living." Id. ¶ 1. In any event, Siler testified at her deposition that people

---

[3] Cook's excessive force claim is not at issue in the instant motion.

3

unfamiliar with the challenges posed to those riding in a motorized wheelchair would have considered the sidewalks at issue a viable option for her travel.

After consulting a municipal code book, Sommerfield issued Siler an Administrative Notice of Ordinance Violation ("ANOV") for obstruction of traffic in violation of Chicago Municipal Code Section 9-40-30.[4] Id. ¶ 36. Siler was then free to leave the area. Defendants contend that the entire stop lasted only twenty minutes, from approximately 5:55 p.m. to 6:15 p.m. Plaintiffs, however, maintain that they were arrested and that their detention lasted for forty-five minutes to an hour, having initially been stopped around 5:15 p.m. and released around 6:15 p.m. The notice to appear did not require the surrender of a license or the posting of a bond.

Siler claims that after this encounter, she was afraid to use the bicycle lanes and "is scared to look at police officers in their eyes" when she does travel in the street in the bicycle lanes. Pls.' Local Rule 56.1(b)(3)(A) Resp. to Defs.' Statement of Alleged Undisputed Facts ¶ 47. Despite her purported fear, it is undisputed that Siler continues to use the bicycle lanes and used the bicycle lanes the very next day on November 2, 2011, posting on her social media page a message stating "[u]tilizing the bicycle lane, CPD!" Id. ¶ 50 (internal quotation marks omitted). Siler admits that she has not sought any treatment or counseling for her alleged mental and emotional injuries that the incident may have caused.

**B. Procedural History**

Plaintiffs filed their initial complaint against Defendants on April 25, 2012. On May 30, 2013, Plaintiffs were granted leave to file their First Amended Complaint. In the First Amended Complaint, Plaintiffs allege the following: (1) false arrest of Siler pursuant to § 1983 (Count I); (2) false arrest of Cook pursuant to § 1983 (Count II); (3) excessive force as to Cook pursuant to § 1983 (Count III); (4) battery of Cook pursuant to state law (Count IV); (5) intentional infliction

---

[4] The citation against Siler was later dismissed.

4

of emotional distress ("IIED") as to both Plaintiffs pursuant to state law (Count V); (6) respondeat superior against the City (Count VI); (7) 745 Ill. Comp. Stat. 10/9-102 claim against the City (Count VII); and (8) unreasonable seizure of Siler pursuant to § 1983 (Count VIII). Defendants now move for partial summary judgment. The motion is fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). The Court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. Id. But before the nonmoving party "can benefit from a favorable view of evidence, [she] must first actually place evidence before the courts." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). Simply showing that there is "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted); see also Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). "Summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'" Majors v. Gen. Elec. Co., 714 F.3d 527, 532 (7th Cir. 2013) (quoting Celotex Corp., 477 U.S. at 322).

**B. Partial Motion for Summary Judgment**

Defendants seek summary judgment on all of Siler's claims as well as Cook's claim against Sommerfield for failure to intervene.

### *1. Count I: False Arrest*

First, Defendants argue that they are entitled to summary judgment on Count I, Siler's false arrest claim. As an initial matter, the Court notes that the parties dispute whether Siler was arrested or merely detained for an investigatory stop and the issuance of a ticket. Siler argues that, although she was not handcuffed or taken to the police station, she was detained for approximately one hour and was not free to leave, thus constituting an arrest under the Fourth Amendment. See Illinois v. Caballes, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). Defendants argue that it was merely an investigatory stop that lasted only twenty minutes, the time in which it took the officers to obtain Siler's identification and look through the municipal code in order to draft the proper citation.

"There is no bright-line rule as to how long an investigative detention may last; instead [courts] look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." Rabin v. Flynn, 725 F.3d 628, 633 (7th Cir. 2013) (internal quotation marks and citation omitted). Even accepting as true that Siler was detained for one hour, the detention was reasonable under the circumstances, particularly where Siler's own actions prolonged the eventual issuance of the citation. See Cady v. Vill. of McCook, 57 F.

6

App'x 261, 264 (7th Cir. 2002) (non-precedential order) (finding a twenty-minute encounter "reasonable in light of the fact that [the plaintiff] engaged the officers in a discussion about religion and his rights," even though the officers only stopped the plaintiff, who was jogging barefoot and talking to himself, in order to inquire as to his identity and well-being). In any event, Siler's claim fails because the officers had probable cause—an absolute defense to a false arrest claim.

"To prevail on [her] constitutional claim for false arrest, [Siler] must show there was no probable cause for [her] arrest." Williams v. City of Chi., 733 F.3d 749, 756 (7th Cir. 2013). "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Id. (quoting Gonzalez v. City of Elgin, 578 F.3d 526, 537 (7th Cir. 2009)). "[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." Holmes v. Vill. of Hoffman Estates, 511 F.3d 673, 682 (7th Cir. 2007).

Here, Thompson witnessed Siler, dressed in all black, traveling in her motorized wheelchair in the street, during rush hour traffic, in downtown Chicago on Jackson Boulevard and again on Clark Street, despite the fact that sidewalks were available on both streets. Pursuant to the City's Municipal Code, "[w]here sidewalks are provided it shall be unlawful for a pedestrian to walk along and upon an adjacent roadway." Mun. Code of Chi. § 9-60-080(a). For purposes of this code, "'[p]edestrian' means any person afoot or any 'pedestrian with a disability', as that term is defined in Section 5 of the Illinois Pedestrians with Disabilities Safety

Act." Id. § 9-4-010. "'Pedestrian with a disability' means a person with a disability . . . who may require the use of a mobility device, service animal, or white cane to travel on the streets, sidewalks, highways, and walkways of this State." 625 Ill. Comp. Stat. 60/5.

Siler, relying on the Illinois Vehicle Code, argues that a genuine issue of material fact remains as to whether the sidewalk was in such a condition as to render its use impracticable by her while traveling in her motorized wheelchair. See 625 Ill. Comp. Stat. 5/11-1007(a) ("[W]here a sidewalk is provided and its use is practicable, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway." (emphasis added)). The City's Municipal Code, however, does not contain a "practicability exception" similar to that contained in the Illinois Vehicle Code. Even assuming that the City's Municipal Code contained an implied practicability exception, it would not be applicable in this case where Thompson reasonably believed that the sidewalks at issue were serviceable for use by Siler. Indeed, Siler admits that people unfamiliar with the challenges of riding in a motorized wheelchair—such as Defendants—would not have found the use of the sidewalks on Jackson Boulevard or Clark Street to be impracticable on the day of the incident. Therefore, Defendants had probable cause to stop Siler because it was reasonable for them to believe, as witnessed by Thompson, that she was committing an offense by operating her motorized wheelchair in the street. See Holmes, 511 F.3d at 682. Because Defendants had probable cause, Count I, Siler's false arrest claim, fails as a matter of law.

### 2. *Count VIII: Unreasonable Seizure*

Next, Defendants argue that they are entitled to judgment as a matter of law on Count VIII of Plaintiffs' complaint because Thompson's use of force against Siler, if any, was reasonable. The Court notes that although Plaintiffs characterize Siler's claim as one for

"unreasonable seizure," in substance, she seeks relief for excessive force. Siler alleges that Thompson used excessive and unreasonable force against her "in forcing his police vehicle to cut off Plaintiff Siler in her wheelchair and grabbing at her, snatching her earphones which were connected to her body while she was attempting to communicate for assistance by telephone" in violation of her Fourth Amendment rights. First Am. Compl. ¶ 47.

"A claim that an officer employed excessive force in arresting a person is evaluated under the Fourth Amendment's objective-reasonableness standard . . . . [which] requires courts to 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Abbott v. Sangamon Cnty., 705 F.3d 706, 724 (7th Cir. 2013) (quoting Scott v. Harris, 550 U.S. 372, 381 (2007)). The reasonableness of the force is an objective inquiry based "on the totality of the facts and circumstances known to the officer at the time the force is applied." Id. Because police officers are often forced to make split-second decisions under uncertain circumstances, courts "'give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations.'" Id. at 724-725 (quoting Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009)).

First, Siler argues that Thompson used excessive force when he "barreled his SUV toward Ms. Siler almost hitting her and causing her to spin her motorized wheelchair to avoid contact." Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., at p. 12. Defendants argue that—after Siler failed to listen to Thompson's first instructions to move to the sidewalk for her safety and she instead maneuvered around his vehicle and continued forward—Thompson activated his flashing lights, followed Siler, and pulled in front of her at the next intersection, effectively halting her progress. While the Court must ordinarily view the facts in a light most favorable to

the plaintiff, Siler's alleged facts are belied by the videotape of the incident captured by a CPD POD camera. See Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The videotape shows the CPD vehicle traveling at a reasonable rate of speed, slower than the traffic around it, and at a reasonable distance from Siler in her wheelchair—not mere inches from her as she alleges. Furthermore, the videotape shows the CDP vehicle with its lights flashing, slowly pull in front of Siler who was able to stop a reasonable distance away. While Siler does eventually turn around in her wheelchair after the CPD vehicle pulls in front of her, she does not do so until the vehicle is already stopped and Thompson begins to exit. The videotape does not display the scene as portrayed by Siler, wherein she is forced to spin her wheelchair around in order to avoid contact with the police vehicle. Based on the uncontroverted videotape evidence, the Court finds that Thompson did not use excessive force when stopping Siler.

Siler also argues that Thompson used excessive force when he repeatedly asked her for her identification, ultimately grabbing for her purse, knocking it over and causing the earphones that she was wearing to fall out. The City's Municipal Code specifically states that a police officer may, when he or she suspects that a traffic or compliance violation has been committed, order a person "to pull to the right side of the roadway promptly" and ask for "appropriate identification." Mun. Code of Chi. § 9-40-030(b)(1), (4). That is precisely what occurred here. Because Siler refused to immediately turn over her identification, it was not unreasonable for Thompson to ask her to do so multiple times. "[Q]uestions concerning a suspect's identity are a routine and accepted part of many Terry stops." Hibel v. Sixth Judicial Dist. Ct. of Nev.,

Humboldt Cnty., 542 U.S. 177, 186 (2004); see also Hayes v. Fla., 470 U.S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify [her], to question [her] briefly, or to detain [her] briefly while attempting to obtain additional information.").

In addition, the Court finds that it was reasonable under the circumstances for Thompson to grab for Siler's purse in an attempt to gain her attention when she was unresponsive to his questions and otherwise making phone calls. The case of Atwater v. City of Lago Vista, 532 U.S. 318 (2001), is instructive here. In Atwater, the plaintiff, who was initially stopped for a seatbelt violation, was ultimately handcuffed, placed in a squad car, taken to the police station, asked to remove her shoes, jewelry and glasses, photographed, and placed in a jail cell for an hour. Atwater, 532 U.S. at 354-355. The court found that, although the arrest and booking of Ms. Atwater was "inconvenient" and "embarrassing," it was "not so extraordinary as to violate the Fourth Amendment." Id. at 355.

Similarly, while Siler describes her encounter with Thompson as violent or frightening, it does not change the fact that Thompson never actually touched her. Nothing in the record indicates that anything fell out of Siler's purse or that Thompson removed anything from within it. This was not so extraordinary as to rise to the level of a constitutional violation. Because Thompson's actions were objectively reasonable given that he was trying to obtain Siler's identification—despite her lack of cooperation—in order to issue her a ticket, summary judgment is granted in favor of Defendants on Count VIII.

### 3. Count V: Intentional Infliction of Emotional Distress

Defendants also argue that they are entitled to summary judgment on Siler's IIED claim in Count V. In order to establish a claim for IIED, Siler must show the following: "(1) that the

defendants' conduct was extreme and outrageous; (2) that they intended their conduct to inflict severe emotional distress or knew there was at least a high probability their conduct would inflict such distress; and (3) that their conduct did in fact cause [the plaintiff] severe emotional distress." Lopez v. City of Chi., 464 F.3d 711, 720 (7th Cir. 2006) (citing McGrath v. Fahey, 533 N.E.2d 806, 809 (Ill. 1988)). "Extreme and outrageous conduct is that which goes beyond all bounds of decency and [is] considered intolerable in a civilized community." Id. (internal quotation marks and citation omitted).

As discussed above, Thompson's interactions with Siler in pulling her over, asking for identification, and eventually grabbing at her purse were reasonable under the circumstances, not extreme or outrageous. Thompson stated that he initially asked Siler to move to the sidewalk because he was concerned for her safety and did not want her to get hit by any cars. Indeed, Siler admits that when Thompson asked her to move onto the sidewalk she thought that he "was attempting to be nice or patronizing her." Pls.' Local Rule 56.1(b)(3)(A) Resp. to Defs.' Statement of Alleged Undisputed Facts ¶ 16. Furthermore, the record indicates that Thompson reached for Siler's purse in order to get her attention so that she could produce her identification. Siler submits no evidence from which a reasonable jury could conclude that Thompson intended to inflict severe emotional distress or that there was any probability of inflicting such distress.

Lastly, Siler fails to show that Defendants' conduct in fact caused her severe emotional distress. At the time of the occurrence, Siler immediately called her attorney for advice on how to proceed instead of listening to Thompson's instructions. Although Siler claims that the incident caused her to be fearful of police officers and fearful of riding her motorized wheelchair in the bicycle lane of the street, the undisputed facts show otherwise. Siler returned to riding in the street the very next day, even taunting the CPD by posting her actions on her social media

12

page stating, "[u]tilizing the bicycle lane, CPD!" Id. ¶ 50 (internal quotation marks omitted). Further, Siler never sought medical attention for her alleged mental and emotional injuries. Siler fails to establish any of the elements IIED, and thus, Defendants are entitled to summary judgment on this claim. In addition, because Siler's substantive claims fail, her claims for respondeat superior (Count VI) and indemnification (Count VII) against the City fail as well. Accordingly, summary judgment is granted in favor of Defendants on all of Siler's claims.

### 4. *Count III: Failure to Intervene Claim*

Finally, Defendants argue that they are entitled to summary judgment on Cook's failure to intervene claim against Sommerfield, contained in Count III of the complaint, for events that may have occurred before Sommerfield arrived—namely when Thompson allegedly threw Cook up against the metal CTA support beam. However, because Cook's claim for failure to intervene is also based on incidents which allegedly occurred in Sommerfield's presence, summary judgment on this claim is premature at this time. Therefore, summary judgment is denied as to Cook's claim for failure to intervene.

### III. CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Defendants on all of Siler's claims (Counts I, V, VI, VII, and VIII), and denied as to Cook's claim for failure to intervene (Count III).

IT IS SO ORDERED.

ENTER:

*[signature]*
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 6, 2013